# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BRIAN EDWARD SCOTT,       )
                                  )
         Petitioner,       )
                                  )     1:11CR236-1
         v.                )     1:14CV483
                                  )
UNITED STATES OF AMERICA,   )
                                  )
        Respondent.     )

## ORDER AND SECOND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Petitioner Brian Edward Scott, a federal prisoner, has brought a motion (Docket Entry 35) seeking to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255. On July 25, 2011, Petitioner was the subject of a three count federal indictment. (Docket Entry 1.) Counts One and Three charged him with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). (*Id.*, Counts One and Three.) Count Two charged him with possession with the intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). (*Id.*, Count Two.)

On December 7, 2011, Petitioner pled guilty pursuant to a plea agreement to Count Two, possession with the intent to distribute cocaine base. (Minute Entry 12/7/2011; Docket Entries 15 and 16.) On April 19, 2012, Petitioner, a career offender, was sentenced to 156 months of imprisonment. (Docket Entry 21; 4/19/12 Minute Entry; Docket Entry 50, ¶ 27.) The Fourth Circuit Court of Appeals affirmed the judgment on April 5, 2013. *United States v. Scott*, 521 F. App'x 112 (4th Cir. 2013). Thereafter, Petitioner pled guilty in May of 2013 in state court to charges of possession of a firearm by a felon (two counts), conspiracy to traffic

in cocaine (one count), and for attaining habitual felon status (two counts), whereupon he received an 88 to 115 month sentence, to be served consecutively to his 156 month federal sentence. (Docket Entry 44, Attach. 3.)

Petitioner next filed the instant § 2255 motion. (Docket Entry 35.) He raised two grounds of ineffective assistance of counsel. The first was that counsel misadvised him during the plea stage. (*Id.*, Ground One.) The second was that counsel failed to advise him regarding the filing of a petition for a writ of certiorari with the United States Supreme Court. (*Id.*, Ground Two.) Petitioner also later moved to amend his § 2255 motion to add a claim pursuant to *Johnson v. United States,* 135 S.Ct. 2551 (2015). (Docket Entry 48.)

The undersigned thereafter entered an Order and Recommendation, granting Petitioner's motion to amend, but recommending that Petitioner's § 2255 motion, as amended, be denied. (Docket Entry 52.) Petitioner then objected to that Recommendation and also moved to amend his § 2255 motion to add an additional ground of ineffective assistance of counsel. (Docket Entries 55 and 56.) The Court denied Petitioner's motion to amend as futile.[1] (Docket Entry 57.) However, in that same Order, the Court also concluded, in light of Petitioner's objections and all of the pleadings on record, to withdraw the part of the

---

[1] More specifically, the undersigned denied as futile Petitioner's effort to raise an additional ground asserting that counsel was ineffective for failing to argue that, based on *Setser v. United Sates,* 566 U.S. 231 (2012), this Court had an obligation under 18 U.S.C. § 3553 to determine whether Petitioner's federal sentence would run concurrent to a possible future state sentence. (Docket Entry 57.) In response, Petitioner filed a document titled, "Objection in Part to Magistrate's Recommendation Denying Petitioner's Motion to Amend Setser claim." (Docket Entry 58.) In it, Petitioner objects to the denial of his motion to amend and requests that the undersigned "rescind" the prior order. (*Id.* at 3.) As such, the undersigned construes this as a motion to reconsider the prior denial to Petitioner's motion to amend. However, because Petitioner has failed to demonstrate any meaningful reason for the undersigned to alter his prior conclusion, that request is denied.

-2-

Recommendation addressing Petitioner's first ground for relief alleging ineffective assistance of counsel. (Docket Entry 57.)

On August 30, 2017, the Court held an evidentiary hearing on Petitioner's first ground for relief. Specifically, the hearing addressed (1) whether plea counsel informed Petitioner, prior to his change of plea, that if he pled guilty in federal court, he could not be convicted in state court of the abovementioned state charges and (2) whether plea counsel misadvised Petitioner, prior to his change of plea in federal court, as to whether any future sentence he might receive for then pending state charges could run consecutive to his ultimate federal sentence. (Docket Entry 57; 8/30/2017 Minute Entry.)

At the hearing, Petitioner was represented by counsel. Counsel clarified the scope of ground one of Petitioner's amended § 2255 motion. (Docket Entry 62 at 40.) Specifically, Petitioner contends that he received ineffective assistance of counsel at the plea bargaining stage. Petitioner contends that prior counsel, Seth Neyhart, was constitutionally ineffective for making him think—inaccurately as it turned out—that if he pled guilty and got a significant sentence in federal court, the state prosecutor would drop his state charges. (*Id.* at 41.) Petitioner contends further that Neyhart was ineffective by telling him "information that he relied on and [by not in any way] tell[ing] him not to rely on that information and, in fact, negotiat[ing a plea agreement] in certain ways based on that information[.]" (*Id.* at 47-48.)

Petitioner further contends that he was prejudiced as a result of Neyhart's error. (*Id.* at 43, 46.) This is because after he pled guilty in federal court and passed upon his opportunity to file a motion to suppress and to go to trial, and was sentenced to 156 months of

-3-

imprisonment, the state prosecuted Petitioner anyway. (*Id.*) He was convicted and received an 88 to 115 month sentence, to be served consecutive to his federal sentence. (*Id.* at 39.)

In light of counsel's clarification as to the scope of Petitioner's first ground for relief, the undersigned has decided to withdraw the prior Recommendation as to ground one only. The Court will substitute this Second Recommendation in its place. All other orders of the Court as to this case, and the remainder of the Court's analysis as set forth in the prior Recommendation, remain in place. As explained in greater detail below, the undersigned concludes that Petitioner's first ground for relief lacks merit and should therefore be denied.

## Evidentiary Hearing

### Seth Neyhart

Petitioner first called his prior defense counsel, Seth Neyhart ("Neyhart"), to testify. (Docket Entry 62 at 3.) Neyhart testified to being a member of the North Carolina State Bar, a member of all three federal districts in North Carolina and the Fourth Circuit, and a member of the CJA panel of the Middle District. (*Id.* at 4.) Neyhart testified that he has been practicing law in federal court since 2001, when he became of a member of the North Carolina State Bar. (*Id.*) Neyhart explained that he was appointed to represent Petitioner in 2011 on a federal indictment that included several counts and that he represented Petitioner through the plea negotiation stage and during his appeal to the Fourth Circuit. (*Id.* at 4-6.) According to Neyhart, based on his discussions with Petitioner, Petitioner ultimately decided to plead guilty pursuant to a plea agreement. (*Id.* at 5.) Neyhart testified that during these discussions with

Petitioner, Petitioner mentioned that he also had pending state charges, some of which overlapped with his federal charges.[2] (*Id.*)

Neyhart testified further that he spoke with Petitioner "about four times" prior to his taking the plea in federal court and that on those occasions they talked about whether Petitioner should take the plea in federal court. (*Id.* at 6.) Neyhart explained that to adequately represent a client who had both federal and state charges, his usual practice was to coordinate a joint strategy with the defendant's state attorney. (*Id.*) In this case, Neyhart stated, he contacted Petitioner's state attorney, Ed Galloway ("Galloway"), and had at least two discussions with him. (*Id.* at 7.) The two spoke generally about the overlapping state and federal charges "to kind of get a joint understanding of the big picture" and they talked further about the state prosecutor's intentions based on Galloway's discussions with the state prosecutor. (*Id.*)

Neyhart's understanding, based entirely on his phone conversations with Galloway, was that the state prosecutor assured Galloway that if Petitioner were "given a considerable federal sentence, then he would dismiss the remaining state charges." (*Id.*) Neyhart stated "I remember asking [Galloway] specifically about a federal sentence that would be within the guidelines range of a career offender such as in [Petitioner's] case with a zero to 20 charge." (*Id.*) Neyhart indicated that he gave Galloway an idea of how much time Petitioner would be

---

[2] The two felon in possession of a firearm charges in Petitioner's federal indictment have the same offense date as the two state felon in possession of a firearm convictions in the state judgement and commitment papers. (Docket Entry 1; Docket Entry 44, Attach 3 at 1.) These two sets of charges therefore appear to be the "overlapping" charges mentioned above. The former were dismissed as part of the federal plea agreement, while Petitioner pled guilty to the latter in state court. (Docket Entry 1; Docket Entry 21 at 1; Docket Entry 44, Attach 3 at 1.)

looking at in federal court and indicated further that he had a "pretty firm recollection" that Galloway concluded that such a sentence would be a "considerable" sentence. (*Id.* at 8.) Neyhart's understanding when he talked to Galloway, therefore, was that the state was going to dismiss the charges if Petitioner received a lengthy sentence in federal court. (*Id.*) Neyhart testified that he conveyed this understanding to Petitioner and that he "probably" did so on at least two occasions. (*Id.*) Neyhart then testified that he "believe[d]" he had this conversation with Petitioner on a least two of his four trips to visit Petitioner. (*Id.* at 9.)

Neyhart testified that he remembered speaking to Petitioner about whether or not the state was going to dismiss charges and that "it was a very important part of our conversations at that time in leading up to the plea." (*Id.*) In fact, Neyhart continued, this was the "most important issue" in deciding whether Petitioner would take the plea. (*Id.*) Consequently, Neyhart answered all the questions Petitioner had and "told [Petitioner] what [his] understanding was from Mr. Galloway." (*Id.*) Neyhart did not know if Petitioner had additional time to speak with Galloway separately or not. (*Id.*)

Neyhart next testified that after Petitioner took the federal plea and found out that the state was still going to prosecute, Petitioner was "very upset." (*Id.* at 9-10.) Neyhart also spoke to Galloway "and he was upset." (*Id.* at 10.) By "upset" Neyhart meant "surprised." (*Id.*) Neyhart testified that he was surprised as well and that he "felt very badly for helping to put [Petitioner] in a position that [Neyhart] didn't think was fair to him." (*Id.*) Neyhart testified that had he known this was going to happen, he would have sought to continue the sentencing hearing in federal court, and gone ahead with the state sentence first, and then asked the federal sentencing judge to put any time concurrent. (*Id.* at 10-11.) Neyhart testified that because he

-6-

believed that there would be no state sentence, he did not recall ever speaking to Petitioner about whether any potential state sentence "was going to be run consecutive or concurrent with the federal sentence." (*Id.* at 11-12.)

Neyhart testified that he believed that Petitioner's guilty plea in federal court was not knowing and voluntarily because Neyhart did not give Petitioner "accurate information on what was going on with respect to the state prosecutor." (*Id.* at 12.) Neyhart testified, "I gave him the information that I believed was the case. You know, in negotiations, you're always going back to your client and telling him what the prosecutor's positions is. I – this case was no different . . . ." (*Id.*)

Neyhart testified that he believed that Petitioner was not advised as to the "risk that the prosecutor would go back on his word" nor was there a discussion of the "risk that we might not really be understanding what the state prosecutor was telling Mr. Galloway." (*Id.* at 12-13.) Neyhart then stated, "You know, you can never, as an attorney, guarantee a result to your client, and I never did that in this case or never would do that. However, what I did give him, I think, was more than a prediction. It was a statement of fact about a position of the state prosecutor that was false and misleading, and I know he relied on that." (*Id.* at 13.)

Neyhart was also presented with a letter he wrote to Petitioner dated May 1, 2013. (*Id.* at 13-14.) Neyhart testified that he wrote this as a cover letter when Petitioner's opinion came back from the Fourth Circuit and they were talking about a petition for writ of certiorari with the Supreme Court that Neyhart filed for Petitioner. (*Id.* at 14.) Neyhart acknowledged that in the letter, he wrote, "I understand that you are currently being held in Guilford County awaiting the disposition of your state charges which we thought would be dismissed." (*Id.*)

Neyhart then clarified that the information he gave Petitioner about the state prosecutor's intentions was not intentionally false and misleading on his part. (*Id.* at 14-15.) Rather, he continued, he believed that the substance of this information was, in fact, false and misleading and that Petitioner relied on it to his detriment. (*Id.* at 15.)

On cross-examination, Neyhart could not recall the exact specifics of Petitioner's indictment in the instant criminal case, but did recall that it involved both guns and drugs and recalled further that, originally, the indictment anticipated Petitioner being an armed career criminal. (*Id.* at 16.) As an armed career criminal, Petitioner would have been subject to a mandatory minimum fifteen years. (*Id.*) Consequently, what charge Petitioner would plead to was a "major factor" during plea discussions with the Government. (*Id.*) Nevertheless, during that time, there were several shifts in the law in which Petitioner ended up not being an armed career criminal. (*Id.*) Neyhart admitted that it was fair to say that Petitioner's advisory guidelines range would have been at least several years longer had he gone to trial and been convicted instead of pleading guilty. (*Id.* at 16-17.)

Neyhart testified further that he spoke with Petitioner about a potential Fourth Amendment issue that he had investigated. (*Id.* at 17.) However, after looking at the Government's evidence, Neyhart explained to Petitioner that it would be in his best interest to attack the sentence rather than the conviction, and therefore take a plea. (*Id.*) Neyhart recalled further that at sentencing, there was a great deal of discussion about whether Petitioner was a career offender, because the law was in flux. (*Id.*) Ultimately the Court and the Fourth Circuit rejected arguments that Petitioner was not a career offender. (*Id.*) Neyhart noted that at sentencing he requested a sentence significantly below the advisory guideline

-8-

range, but that request was denied. (*Id.* at 18.) The Court did not consider going over the guideline range, however. (*Id.*)

Neyhart admitted that, given the changing law at the time, there were "a lot of unknowns about what sentence [Petitioner] would get." (*Id.* at 19.) Neyhart admitted that he spoke with Petitioner's state attorney, Galloway, in an effort to reach a global settlement in Petitioner's best interest. (*Id.*) Neyhart explained that he never actually misrepresented to Petitioner what Galloway told him. (*Id.*) In fact, Neyhart added, it was the state prosecutor that misrepresented what was going to occur. (*Id.* at 20.)

Neyhart admitted that if he went ahead with Petitioner's sentencing in state court before being sentenced in federal court, Petitioner might have had more criminal history points at his federal sentencing. (*Id.*) However, Neyhart continued, because Petitioner was being sentenced as a career offender on the federal side, his criminal history would have been fixed at six, which is the highest level, so extra points would have been immaterial. (*Id.*) Neyhart admitted further that in considering the § 3553(a) factors, a district court could consider convictions even though they do not increase criminal history and, moreover, the judge could even consider dismissed counts as well. (*Id.* at 20-21.) Neyhart acknowledged that it is possible the district court could have ordered that the federal and state sentences run consecutive, but, "at least [the Court] would have been able to make that decision consciously." (*Id.* at 21.)

Neyhart stated further that a Rule 11 hearing is not always perfect and "doesn't always pick up everything that happens." (*Id.*) "In this case," Neyhart explained, "there was no guarantee or promise to Mr. Scott, but there was information given to him that was material

that was – that was incorrect." (*Id.*) Neyhart admitted that this information came "through" him, but that it "was the information that [he] got [from Galloway] that [he] gave to Mr. Scott." (*Id.*) Neyhart testified that, "If, in fact, there was any dishonesty . . . it would've been somewhere between the state prosecutor and the state attorney." (*Id.* at 21-22.) Nevertheless, according to Neyhart, "everything that [he] communicated to Mr. Scott was what [he was] told" and "what [he] believed was correct at the time." (*Id.* at 22.)

Neyhart was then asked if he ever told Petitioner prior to the time he pled guilty in federal court that he could not be convicted in state court. (*Id.*) To this, Neyhart responded:

> I don't recall a specific discussion of what all the theoretical possibilities were, which as long as it's still standing out there, it's possible that it could come back to bite you. But I don't remember a specific conversation about that. If there was a conversation about that, I would have acknowledged that possibility.

(*Id.*) Neyhart then reiterated, "I don't remember one." (*Id.*)

Neyhart explained further that the state typically dismisses its charges when a defendant is convicted in federal court of the same conduct. (*Id.* at 22-23.) However, it "doesn't always happen automatically." (*Id.* at 23.) Prior to this case, Neyhart explained, he had one or two cases where the state prosecutor was not ready to dismiss. (*Id.*) By way of example, Neyhart had so coordinated with a state defense attorney in a prior case in the Eastern District and come to a resolution "that we weren't surprised by." (*Id.*)

Neyhart admitted that here he "told Mr. Scott that the state prosecutor was waiting to see what sentence [Petitioner] would get in federal court before he made his decision[.]" (*Id.*) The Government then asked Neyhart if this conveyed to Petitioner "that there was still some uncertainly as to what would happen in state court[.]" (*Id.*) Neyhart responded, "To the extent

I told him that and there's an inherent uncertainty, I would agree with that, but I also gave him specific information about the prosecutor's stated intentions." (*Id.*) Neyhart testified that it was fair to say that he told Petitioner what he believed was true. (*Id.*) Neyhart stated, "And the information I received, I conveyed to [Petitioner] to my best knowledge and understanding at the time." (*Id.*)

When asked if he advised Petitioner that any potential sentence that he could get in state court could not run consecutive to what he got in federal court, Neyhart responded:

> My understanding of the issue at that time was that it's really the second sentencing judge who would make the decision on where the second sentence is going to be served, and I can say that I definitely did not and would not tell him that any sentence in the state court could not be consecutive. So that is a statement I did not make and would not have made.

(*Id.* at 23-24.)

On redirect, Neyhart testified that if he were faced with a similar set of circumstances now, he would "be less quick to assume that the state guy had an accurate assessment of what was going on on his side." (*Id.* at 24.) Neyhart reiterated that the information that Petitioner based his plea agreement on was incorrect and that Petitioner gave up his right to a suppression hearing and a trial when he took the plea agreement. (*Id.* at 25.) Had he (Neyhart) known the state was going to pursue its charges, he would have tried to postpone the federal sentence so that an argument for concurrent sentences could be made. (*Id.*) The opportunity to make this argument was lost because of the incorrect information. (*Id.*)

Neyhart acknowledged that while the state typically dismisses similar charges from similar events, it does not always do this. (*Id.* at 25-26.) According to Neyhart, often state charges are dismissed that have no bearing to the federal indictment and the incidents charged

therein. (*Id.* at 26.) According to Neyhart, this was the first time that he had ever gotten information from involved attorneys (defense attorneys or prosecutors) saying that cases were going to be dismissed, and then those cases were not dismissed. (*Id.*) Neyhart indicated further that both he and Petitioner believed that the state charges were going to be dismissed and they acted on these premises. (*Id.* at 26-27.) Neyhart explained that "All our discussion was based on the state was going to dismiss and now what can we do on the federal side." (*Id.* at 27.) This was a "primary part of the plea strategy." (*Id.*)

On re-cross examination, Neyhart acknowledged that Petitioner pled guilty in state court after being sentenced in federal court. (*Id.* at 28.) At the sentencing in state court, the "sentence that [Petitioner] agreed to called for a consecutive sentence." (*Id.*) Neyhart added, however, that it was his understanding, based on conversations with Galloway, that the state prosecutor insisted on this, that it caught Petitioner by surprise, and that Petitioner's decision was only voluntary in that it was "what he viewed at that point in time as the least problematic option for him." (*Id.* at 28.) Nevertheless, Neyhart admitted that Petitioner had a right to go to trial in state court, and that he instead chose to plead guilty in state court, just as he chose to plead guilty in federal court. (*Id.*) Neyhart recalled that there was a Fourth Amendment issue as to only one of the incidents in the indictment and he did not recall which one. (*Id.*)

### Petitioner

Petitioner testified next. He stated that when Neyhart met with him to discuss whether to plead guilty or go to trial, they talked about the state charges. (*Id.* at 30.) According to Petitioner, Neyhart "said that since I was going to get a significant time if I pleaded a career – plead guilty and be sentenced as a career offender, the state was going to dismiss the charges."

(*Id.*) Petitioner stated that this was "a definite thing that was going to happen" and "that's the reason why [he] pled [guilty]." (*Id.*) According to Petitioner, there were no conversations involving the possibility that the state might not dismiss the charges. (*Id.* at 30-31.)

Petitioner testified that he was sentenced in federal court in April of 2012 and he was sent to Butner Correctional. (*Id.* at 31.) Almost a year later, the state "just came out of the blue" with a writ for him to return to state court. (*Id.*) Petitioner stated that he called Neyhart to inquire about what was happening, and Neyhart initially stated that he did not know. (*Id.*) Later, Neyhart stated that Petitioner should "[f]ile [an] ineffective assistance of counsel [claim] against him" because Neyhart told him "that the charges would be dismissed," that is, that the state charges "were supposed to be dismissed." (*Id.*) Petitioner stated that Neyhart sent him a letter, mentioned earlier, indicating Neyhart "thought" the charges would be dismissed. (*Id.*)

Petitioner testified that he and Neyhart never talked about running the state and federal charges together, because Neyhart said "they would be dismissed. There weren't supposed to be any state charges." (*Id.* at 31-32.) This was the "main issue" on Petitioner's mind during the plea negotiations and Petitioner testified that "[h]ad [he] understood that there was a chance of those state charges being prosecuted" he would not have taken a plea but would have gone to trial in federal court. (*Id.* at 32.) Petitioner testified that he told Neyhart that the dismissal of the state charges was "the most important thing" to him. (*Id.*)

On cross examination, Petitioner acknowledged that he had two gun counts and a drug count in his federal indictment and that the offense dates were separate. (*Id.* at 33.) Petitioner testified that he was not saying that he did not have the guns or drugs, but was instead saying that he would not have pled guilty in federal court if the state was not going to dismiss the

-13-

charges. (*Id.*) Petitioner acknowledged his 156 month sentence for the federal drug charge. (*Id.* at 34-34.) He acknowledged further that had he gone to trial in federal court and been convicted he could have gotten a twenty year (240 month) sentence under an advisory guidelines range of 210 to 240 months. (*Id.* at 34.) Petitioner acknowledged that his attorney unsuccessfully argued for an even lower sentence of 74 months at sentencing. (*Id.* at 35.)

Petitioner testified that he remembered his Rule 11 hearing. (*Id.*) He explained that "at the time, I was under the impression that my charges would be dismissed because at the time these same charges were the same charges I was facing in federal court. I thought that once the federal indictment is issued, the state charges are automatically dismissed, and that's what he told me, that my state charges would be dismissed." (*Id.*) According to Petitioner, Neyhart "said since I was getting a significant amount of time as a career offender, if I plead guilty, my state charges would be dismissed." (*Id.* at 36.) Petitioner testified that Neyhart did not say they "might" be dismissed, but instead said, they "would" be dismissed. (*Id.*) Petitioner testified further that had he known he was going to be prosecuted in state court, he would have gone to trial in federal court. (*Id.*)

Petitioner testified further that after his federal sentencing, he did not know his state charges were still pending. (*Id.*) He said, the day before he took the state plea, his state attorney told him that if he did not take the plea, he would "refrain from being my lawyer, so I took the plea." (*Id.* at 37.) Petitioner testified that he took the state plea, because if he did not, his attorney would have "refrain[ed] from being [his] lawyer" and that was "a hired attorney that my family hired." (*Id.*) Petitioner stated that he did not go to trial in state court because he would not have had proper representation. (*Id.* at 38.) Petitioner acknowledged that he could

-14-

have asked for a new attorney, but "if you think about it, I had just relied on two lawyers, one in the federal level and another hired, that said these charges would be dismissed." (*Id.*)

Petitioner testified that he did not know until after his state sentencing that his state sentence would be served consecutive to his federal sentence. (*Id.*) Petitioner said that agreeing that his state sentence be served consecutive to his federal sentence was not part of the state plea agreement. (*Id.* at 38-39.) When asked if his state attorney forced him to plead guilty in state court, Petitioner testified that:

> I felt that I was forced to plead to a charge or charges that was supposed to be dismissed that – it's like I was just railroaded, like bombarded, like I didn't know these charges still existed. They were supposed to be dismissed. He told me that these charges would be dismissed. If you plead guilty to these federal charges, since you're getting a significant amount of time as a career offender, your state charges be dismissed. I go to the prison. I'm in school and everything. A year later, they come back and take me back, and I don't know what I'm back for.

(*Id.* at 39-40.)

When asked again if he could have gone to trial on the state charges, Petitioner stated, "Yeah, I guess so." (*Id.*) When asked whether he chose to plead guilty, Petitioner testified, "Yeah, I mean, I felt like I had no choice at the time." (*Id.* at 40.)

## Ground One

In order to prove ineffective assistance of counsel, a petitioner must establish, first, that his attorney's performance fell below a reasonable standard for defense attorneys and, second, that he was prejudiced by this performance. *See Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner bears the burden of affirmatively showing deficient performance. *See Spencer v. Murray*, 18 F.3d 229, 233 (4th Cir. 1994). To demonstrate inadequate performance,

-15-

the defendant "must show that counsel's representation fell below an objective standard of reasonableness" measured by "prevailing professional norms." *Id.* at 688. To show prejudice following a guilty plea, a petitioner must establish that there is a reasonable probability that but for counsel's allegedly deficient conduct, he would not have pled guilty but would have gone to trial. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). The court must determine whether "a decision to reject the plea bargain would have been rational under the circumstances." *Padilla v. Kentucky*, 130 S.Ct. 1473, 1485 (2010) (citing *Roe v. Flores-Ortega*, 528 U.S. 470, 480, 486 (2000)). This determination is an objective one "dependent on the likely outcome of a trial had the defendant not pleaded guilty." *Meyer v. Branker*, 506 F.3d 358, 369 (4th Cir. 2007).

"In assessing the credibility of witnesses, trial courts consider 'variations in demeanor and tone of voice." *Rahman v. United States*, No. 7:08-CR-126-D, 2013 WL 5222160, at *5 (E.D.N.C. Aug. 27, 2013) (unpublished) (quoting *Anderson v. City of Bessemer City, NC.*, 470 U.S. 564, 575 (1985)), *adopted by* 2013 WL 5230610 (E.D.N.C. Sept. 16, 2013) (unpublished). "In addition, '[d]ocuments or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.' " *Rahman*, 2013 WL 5222160, at *5 (citing *United States v. Marcavage*, 609 F.3d 264, 281 (3d Cir. 2010)). "Additional considerations can include the witness's motive to lie and the level of detail in the witness's statements." *Id.* (citing *United States v. Wilson*, 624 F.3d 640, 665 (4th Cir. 2010)).

### *Findings of Fact*

Much of the testimony of Neyhart and Petitioner is materially similar and requires no judgment of credibility. There are a few exceptions to this overlapping testimony, however,

-16-

and they require a credibility determination by the Court. Although the Court will make specific credibility determinations below, it notes too that, as a general matter, it finds Neyhart's testimony credible. This is especially so given Neyhart's tone and demeanor, as well as the content of his testimony, particularly as to his experience as a criminal defense attorney.

Neyhart's testimony also demonstrates a willingness to critique his own performance in this case. This further bolsters Neyhart's credibility and suggests that he has no interest in obscuring the truth in order to, for example, protect his reputation. Petitioner, on the other hand, has much to potentially gain and little to lose in embellishing the truth. Consequently, the Court adopts as fact below much of Neyhart's testimony on what transpired in this case from plea bargaining through sentencing. Additionally, where Petitioner's testimony is at odds with Neyhart's, Neyhart is the more credible for the reasons set forth above.

The Court therefore makes the following credibility determinations. First, Petitioner testified that he believed at the time of his change of plea in federal court that "once the federal indictment is issued, the state charges are automatically dismissed[.]" (Docket Entry 62 at 35.) The Court does not find this testimony persuasive, however. This is because the Court finds credible Neyhart's testimony that he told Petitioner during the plea negotiation stage that the state prosecutor would wait to see what sentence he would receive in federal court before he decided whether to dismiss the state charges. Petitioner knew that the discretion of whether he would be subject to state court prosecution lie with the state court prosecutor and he knew further that a federal indictment did not result in an automatic dismissal of state court charges. In fact, the entire exchange between Galloway, Neyhart, and Petitioner was predicated upon an understanding that it was possible for Petitioner to be convicted of both his state and

-17-

federal charges. Therefore, the Court does not find Petitioner's testimony that he believed a federal indictment led to the automatic dismissal of the state charges to be credible.

Second, and likewise, Petitioner testified that Neyhart told him that "since I was getting a significant amount of time as a career offender, if I plead guilty [in federal court], my state charges would be dismissed." (*Id.* at 36.) The Court concludes that this only tells part of the story. As an initial matter, the Court finds as fact that Petitioner and counsel proceeded through plea bargaining and sentencing upon the premise that Galloway's representations regarding the state court prosecutor were accurate.

However, the Court also finds as fact too that Neyhart told Petitioner that the state prosecutor was waiting to see what sentence he would get in federal court before deciding whether to dismiss the state charges. The Court concludes that Petitioner therefore knew that the question of whether the state charges would be dismissed turned ultimately upon the discretion of the state court prosecutor. Petitioner also told this Court under oath at his change of plea that no one had made any promises, other than those contained in the plea agreement, to induce him to plead guilty. (Docket Entry 30 at 7-8.) Neyhart made a similar representation to the Court. (*Id.* at 3.) The Court concludes, therefore, that Petitioner knew that Neyhart's representations about the likelihood of a state prosecution were not, ultimately, a guarantee or a promise, but rather an expectation based on the reported representations of the state prosecutor.

Beyond this, and in light of the above, the Court sums up its factual findings as follows: Petitioner and Neyhart both believed—through the plea bargaining and sentencing stages of this case—that if Petitioner pled guilty in federal court and received a significant sentence, the

Case 1:11-cr-00236-WO    Document 63    Filed 10/05/17    Page 18 of 24

state court prosecutor would dismiss Petitioner's state court charges. Neyhart believed this because Galloway (Petitioner's state attorney) told him as much after Neyhart reached out to Galloway during the federal plea bargaining stage in an effort to coordinate a joint federal-state criminal defense strategy that was in Petitioner's best interest.

Galloway, in turn, represented that he had been informed of the same by the state prosecutor. Neyhart accurately conveyed this information to Petitioner, as he believed it to be true at the time, telling Petitioner that the state prosecutor had represented that if Petitioner pled guilty in federal court and received a considerable sentence, the state prosecutor would dismiss the state charges.

Neyhart also told Galloway how much time Petitioner would likely be facing in federal court and Galloway concluded that such a sentence would be a considerable sentence. Nevertheless, Neyhart also told Petitioner that the state prosecutor was waiting to see what sentence he would get in federal court before he decided whether to dismiss the state charges. Neyhart conveyed all of this information accurately to Petitioner as it was told to him.

Both counsel and Petitioner proceeded thereafter on the premise that if Petitioner pled guilty and received a significant amount of time in federal court, his state court charges would be dismissed. Because Neyhart and Petitioner relied on the reported representations of the state prosecutor, and therefore believed that Petitioner's state charges would be dismissed after federal sentencing, they did not did not discuss the possibility of consecutive, concurrent, or partially concurrent state and federal sentences. Therefore, Neyhart never told Petitioner that a state court sentence could not be consecutive, nor did Neyhart promise or guarantee a particular result to Petitioner in this case. Neyhart also advised Petitioner, that given the

-19-

evidence against him, it would be in Petitioner's best interest to attack the sentence in this case rather than attack the conviction and that, therefore, a guilty plea was advisable.

These events occurred prior to Petitioner's change of plea and were material to his decision to plead guilty. Petitioner pled guilty in federal court, in accordance with counsel's recommendation, which was premised upon the reported representations of the state prosecutor, and was sentenced to 156 months of imprisonment. The state court charges were not dismissed. Petitioner, Neyhart, and Galloway were all surprised because, as noted, they were under the impression that a federal sentence of that magnitude would result in the dismissal of the state charges. Petitioner later pled guilty in state court to his state charges.

### Conclusions of Law

In light of the above, the Court concludes that Petitioner has failed to carry his burden and demonstrate that Neyhart's performance fell below an objectively reasonable standard.[3] As explained, Neyhart accurately represented to Petitioner the information conveyed to him through Galloway and the state prosecutor during the plea bargaining stage. Neyhart and Petitioner reasonably took these representations as true at the plea bargaining, change of plea, and sentencing stages, given that there was no reason to doubt them.

Neyhart did not misadvise Petitioner. *See Ostrander v. Green*, 46 F.3d 347, 355 (4th Cir. 1995) ("Ordinarily, an attorney need not advise his client of the myriad 'collateral consequences' of pleading guilty. However, where the client asks for advice about a 'collateral

---

[3] Because the Court concludes that Neyhart's performance was not objectively unreasonable, Petitioner fails the first prong of *Strickland* and the Court need not address the question of prejudice. As a result, the Court does not address the recent case decided by the United States Supreme Court discussing the prejudice prong of *Strickland*. *Lee v. United States*, 137 S. Ct. 1958 (2017).

consequence' and relies upon it in deciding whether to plead guilty, the attorney must not grossly misinform his client about the law.") (citation omitted), *overruled on other grounds by O'Dell v. Netherland*, 95 F.3d 1214, 1223 (4th Cir. 1996). At no point did Neyhart present his understanding of the state prosecutor's position to Petitioner as a guarantee or a promise, but instead he represented that position in terms of a reasonable expectation. Nevertheless, at all stages, both Neyhart and Petitioner knew that the discretion as to whether the state charges would ultimately be dismissed or prosecuted lie with the state prosecutor. Neyhart did not tell Petitioner that the state prosecutor could not prosecute him for his state charges or that any sentence in state court could not be consecutive to the sentence in federal court. For all these reasons, both Petitioner and Neyhart knew that there was some chance, even if remote, that Petitioner could be prosecuted in state court after a federal guilty plea. This case is one of disappointed expectations and not of an unfulfilled promise or of legal misadvice. Disappointed expectations, in this context, do not warrant relief.[4]

In hindsight, Neyhart could have perhaps advised Petitioner differently. Neyhart now regrets that he did not discuss with Petitioner the "risk that the prosecutor would go back on his word" or the "risk that we might not really be understanding what the state prosecutor was

---

[4] *See, e.g., Little v. Allsbrook*, 731 F.2d 238, 241 (4th Cir. 1984) ("An attorney's 'bad guess' as to sentencing does not justify the withdrawal of a guilty plea and is no reason to invalidate a plea."); *Vanater v. Boles*, 377 F.2d 898, 900 (4th Cir. 1967); *United States v. Futeral*, 539 F.2d 329, 330 (4th Cir. 1975) (concluding that "[w]hile [the defendant] had a strong basis for hope that the court would follow [sentencing] recommendation, he was not misled in any way" and so the plea was not rendered involuntary by trial court's rejection of prosecutor's sentencing recommendation even though defendant told by his attorney that the court accepted such recommendations in 80 to 90 percent of the cases; *Talouzi v. United States*, No. CIV.A. 3:13-9385, 2014 WL 2712252, at *6 (S.D.W. Va. June 16, 2014) ("[E]ven assuming as Talouzi alleges that Counsel incorrectly predicted that Talouzi would receive a concurrent sentence on his supervised release violation, this alone does not amount to constitutionally deficient representation.") (unpublished).

telling Mr. Galloway." (Docket Entry 62 at 12-13.) Nevertheless, Petitioner's claim turns not on what could have been done in hindsight, or what the best practices might be for dealing with concomitant federal and state charges in a changing legal landscape.

Instead, Petitioner's claim turns, in the first instance, on whether Neyhart's performance in this case was objectively reasonable. The Court concludes that it was. Here, Neyhart had no reason to doubt the representations of Galloway regarding the state prosecutor. Consequently, for the reasons set forth above, and given the absence of any evidence suggesting that there was a reason to doubt the representations of the prosecutor as told to Neyhart by Galloway, the Court concludes that Neyhart's reliance on the same was objectively reasonable. Nor did Neyhart guarantee or promise a particular result in this case. Rather, Neyhart made it clear that whether the state prosecutor dropped the state charges was a decision to be made by the prosecutor. In light of all this, Neyhart was not constitutionally required to discuss further with Petitioner the risks Petitioner now identifies above. Accordingly, Petitioner's first ground for relief should be denied.

Last, at the evidentiary hearing, Petitioner's court-appointed counsel in this proceeding asserted that, "I . . . think the plea wouldn't be voluntary under a Rule 11 analysis either." (Docket Entry 62 at 48.) However, Petitioner never directly raised that ground in these proceedings, nor has court-appointed counsel attempted to raise it in a motion to amend. And, even if a proposed amendment along these lines were before the Court, and even if it was not denied as futile for being time-barred, it would fail.

Specifically, Petitioner's statements at the Rule 11 hearing defeats any such claim. "[S]tatements of fact by a defendant in Rule 11 proceedings may not ordinarily be repudiated,

-22-

and, similarly, findings by a sentencing court in accepting a plea constitute a formidable barrier to attacking the plea." *United States v. Wilson*, 81 F.3d 1300, 1308 (4th Cir. 1996) (citations, quote marks omitted). Absent "extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should . . . dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements." *United States v. Lemaster*, 403 F.3d 216, 221-22 (4th Cir. 2005).

At the Rule 11 hearing in Petitioner's federal proceeding, he acknowledged, under oath, that he might receive a sentence more severe than recommended in the plea agreement; that no one had made any threats or promises to induce him to plead guilty; that no one had forced him to plead guilty; that by pleading guilty he would receive a sentence of not more than twenty years; that he understood the maximum penalties that applied; that his sentence could be different from any estimated range provided by his attorney and that the Court had the authority to impose a sentence more severe than the sentence called for by his guideline range; that he had the right to a trial by jury; that he was fully satisfied with the services of his attorney; and that he was pleading guilty because he was, in fact, guilty. (Docket Entry 30 at 3, 5, 7-15.)

If Petitioner is asserting that that he was not informed prior to his change of plea by counsel of his right to a jury trial in his federal prosecution or of the appropriate sentencing range he might face in that prosecution, those claims would fail in light of the Court's curative instructions at the Rule 11 hearing. *See United States v. Foster*, 68 F.3d 86, 88 (4th Cir. 1995) ("[A]ny misinformation [Hawkins] may have received from his attorney was corrected by the trial court at the Rule 11 hearing[.]").

Beyond this, as explained, Petitioner was not promised or guaranteed that his state charges would be dismissed if he pled guilty and received a significant sentence, nor was Petitioner misadvised on the law. While Petitioner may have had a reasonable expectation that his state charges were going to be dismissed, the law, as noted, does not provide relief for disappointed expectations. And, as further explained, Petitioner knew that whether the state charges would be prosecuted turned on the discretion of the state prosecutor. Consequently, Petitioner's guilty plea in this case was knowing and voluntary.

### Conclusion

For the reasons set forth above, Petitioner's first ground for relief should be denied.

**IT IS HEREBY ORDERED** that the section of the First Recommendation (Docket Entry 52, Analysis of Ground One, at 2-8) identified above be withdrawn.

**IT IS RECOMMENDED** that Petitioner's motion to vacate, set aside or correct sentence (Docket Entry 35), as amended, be denied for the reasons set forth above and for the reasons set forth in pages nine through eleven of the undersigned's prior Recommendation (Docket Entry 52) and that this action be dismissed.

United States Magistrate Judge
Joe L. Webster

October 5, 2017

-24-